Maston Clay LONG et al., Appellants,

v.

Joe William SURLS et al., Appellees.

No. 14778.

Court of Civil Appeals of Texas.

Dallas.

Feb. 4, 1955.

Rehearing Denied March 4, 1955.

Leachman, Gardere, Akin & Porter, Henry D. Akin, Dallas, for appellants.

Carter, Gallagher, Roberts, Jones & Magee, Joe Hill Jones, Ben T. Warder, Jr., and George E. Hughes, Dallas, for appellees.

CRAMER, Justice.

This is a common law damage suit for personal injuries and property damage growing out of a collision at or near the intersection where Corning Street dead-ends into Lancaster Road within the City limits of Dallas at 2:25 a. m. on February 23, 1952. Appellant Long was driving a 1951 Interational Pickup Truck, owned by appellant Windshield Glass Mfg. Company, in a northerly direction on Lancaster Road and was turning west into Corning. Appellee Surls was driving a 1951 Chevrolet sedan in a southerly direction on Lancaster and came over and down a hill at a rate of speed in excess of 30 miles per hour. The collision occurred on the west side of Lancaster as appellant Long was making his left turn. Appellee's automobile after skidding approximately 40 feet, knocked the truck back 30 feet down Lancaster. Billie Jeannine Stapleton, wife of appellant Billy Joe Stapleton, and her infant son Earvin Lee Stapleton, were passengers in the truck. Both vehicles were damaged and appellee Surls and Billie Jeannine Stapleton and Earvin Lee Stapleton all received personal injuries. Appellee Surls brought suit against appellant Long for personal injuries and property damages to his Chevrolet sedan. Appellee Carl R. Gray, Jr., Administrator of Veterans Affairs, filed a plea of intervention to recover $631 hospital expenses incurred on behalf of appellee Surls at the Veterans Administration Hospital at McKinney, Texas, as a result of the injuries sustained by appellee Surls in said collision. Appellant Billy Joe Stapleton, individually and as next friend for his minor son, Earvin Lee Stapleton, and the Windshield Glass Mfg. Company brought suit against appellee Surls for personal injuries to Billie Jeannine Stapleton and Earvin Lee Stapleton, and property damage to the truck. The two suits were consolidated and tried together.

In response to special issues the jury found: (1) That Surls had the right of way; (2) that appellant Long failed to yield the right of way; (3) that such failure was a proximate cause of the collision and (4) the sole proximate cause of the collision; (5) that Surls in his automobile was in a position of peril; (6) that Long discovered and realized such peril to be one from which Surls would probably not be able to extricate himself; (7) that such discovery was in time that by the use of ordinary care and all means at his command consistent with his own safety and that of his passengers and his truck he could have avoided the collision; (8) that Long, after such discovery, failed to exercise ordinary care to use all means at his command consistent with safety to himself, his passengers and the truck to avoid the collision; (9) that such failure proximately caused the collision; (10) the charge contains no issue No. 10; (11) Surls did not fail to keep a proper lookout; (12) not answered according to instruction; (13) that appellee Surls was operating his automobile at a rate of speed in excess of 30 miles per hour; (14) but that such speed did not proximately cause the collision; (15) that Surls was operating his automobile at an excessive rate of speed under the then existing circumstances; but (16) such excessive speed was not negligence; (17) not answered; (18) that at the time, etc., Long did not have the right of way; (19–20) not answered: (21) found that appellee Surls did not fail to have his automobile under proper control; (22) not answered; (23) that Surls on the occasion in question failed to apply his brakes in time; (24) but such failure was not negligence; (25) not answered; (26) Surls did not fail to decrease his speed immediately prior to the accident; (27–28) not answered; (29) Surls did fail to turn his automobile to the left in time to avoid the collision; (30) but such failure was not negligence; (31) not answered; (32) that the accident was not unavoidable; (33) that Surls was not suddenly confronted with an emergency; (34) not answered; (35) that immediately before the collision appellant Long in his automobile was not in a position of peril; (36 to 39 inclusive) not answered. The jury then found for injuries as follows: (40) To Billy Joe Stapleton $750; (41) Earvin Lee Stapleton $250; (42) to appellee Surls $16,910.

Appellants brief fifteen points of error which for convenience will be considered as briefed in groups. Points 1 to 9 inclusive comprise the first group and are in substance: (1) The trial court erred in overruling appellants' motions for judgment in their favor, disregarding the jury's answers to issues 4, 6, 7, 8, 9, 14 and 16; (2) in not holding there was no evidence to support the answer that Long's failure to yield the right of way was the sole proximate cause of the collision; (3) in not holding the evidence insufficient to support the jury's finding that appellant Long's failure to yield the right of way was the sole proximate cause of the collision; (4) in not holding that there was no evidence to support the finding that appellant Long discovered appellee Surls to be in a position of peril from which he would not be able to extricate himself by the use of ordinary care in the use of all means at his command, and failure to use ordinary care to use such means, and that such failure proximately caused the collision; (5) in not holding the evidence insufficient to support the jury's findings on discovered peril; (6) in not holding there was no evidence to support the jury's finding that Surls' operation of his automobile in excess of 30 miles per hour did not proximately cause the collision; (7) in not holding the evidence was insufficient to support the jury's finding that Surls' operation of his automobile in excess of 30 miles per hour was not a proximate cause of the collision; (8–9) in not holding there was no evidence, or there was insufficient evidence to support the jury's answer to issue No. 16 that the excessive speed under the existing circumstances was not negligence.

These points are countered that: (1) Trial court correctly overruled Long's motion for judgment; (2) issue No. 4 is supported by the evidence; (3) the evidence supports the jury's findings to issues 5 to 9

inclusive; (4) the jury's finding to issue 14 is supported by the evidence; (5) issue 16 is supported by the evidence.

In considering these points we will first consider the question of no evidence to support the jury's findings to issues 4, 6 to 9 inclusive, 14 and 16. Issue No. 4 was the last of a series of four issues: In issues 1, 2, 3, and 4 the jury found that Surls had the right of way; that Long failed to yield the right of way; that such failure was proximate cause and also the sole proximate cause of the collision. By issues 5 to 9 the jury found, simply stated, that Surls was in a position of peril which position was discovered and realized to be one from which Surls probably would not be able to extricate himself; and such discovery was in time that Long, consistent with his own and his passengers' and his truck's safety, could have, by the use of all means at his command, avoided the collision. By issues 13 and 14 that Surls was operating his automobile in excess of 30 miles per hour, but that such speed did not proximately cause the collision.

To sustain the jury's findings it is only necessary that the evidence preponderate in favor of the findings. Under the above rule the evidence favorable to the verdict was in substance as follows:

Maston Clay Long, appellant, testified material to the points that he was about a block from the intersection when he saw Surls' lights creeping up over the hill. The hill was a long city block away from the intersection, approximately three or four hundred feet; that he kept his eyes on Surls at all times while he was coming down the road; that he was on his right side of the road and Surls was on his proper side of the road; he was around 90 or 100 feet from Corning when he could see Surls' lights good. When he saw Surls' lights reflecting over the hill he (Long) was going about 30 miles an hour, and when he entered his turn the cars were about 100 feet apart. Just as he started making his turn, Surls was upon him, at which time he (Long) was traveling about 20 miles per hour. When he started his turn Surls was

around 50 or 60 feet away; and he (Long) was angling toward the intersection and he had traveled about a distance of around six feet on the west side of the road before the impact occurred. Surls never did drive over on the wrong side of the road before the collision. He kept his eye on Surls all of the time he was coming down the road and Surls was going fast; and as follows:

"Q. Now, at the time you started your turn, your left-hand turn, how far north of that intersection was Mr. Surls' car, in your best judgment, at that time, not when you actually had made your forty-five degree angle, but at the time you started your turn and at the point, say, when your left front wheel was just going over the center line, how far do you estimate Mr. Surls was north of that intersection then? A. A hundred feet, sir. * *

"Q. And in your best judgment, at what rate of speed was Mr. Surls' automobile being driven or traveling at the time you started into your turn? A. I would say approximately between sixty and seventy miles an hour, sir.

"Q. In your best judgment, did that speed decrease at all before the moment of impact? A. That I couldn't tell, if it did.

"Q. Was there any appearance to you of a decrease in speed? A. No, sir.

"Q. And about what speed were you running at the moment of impact? A. Twenty miles an hour."

Long also testified as follows:

"Q. Now, Mr. Long, I believe you testified here a minute ago that there appeared to be no reduction of speed on the part of Mr. Surls? A. That is right.

"Q. Prior to the impact? A. Yes, sir.

"Q. You had your eye on him at all times from the time he came over the hill? A. Yes, sir."

The police officer who investigated the accident testified material here as follows: Long had been drinking beer but indications showed that he had not had enough to be arrested (Long in his evidence admitted drinking two cans of beer); that from what he could see and observe from the broken glass and debris, the position of the cars, and the skid marks, the collision occurred at a point fifteen feet south of the south curb line of Corning Street. He actually made his report as showing the collision occurred in the 3100 block of South Lancaster Road and that if it had been in the intersection he would have made the notation as Corning and South Lancaster. From the damage to Long's truck it appeared that the brunt of the impact would be on the right front corner of the truck; that would be the headlight, on back to around the right wheel, and would indicate to him that the truck was in the act of making a left-hand turn, and that it was not a so-called head-on collision. That from the location of the pickup truck on the street, Long was coming in at an angle on the south side of Corning Street.

Mrs. Billie Jeannine Stapleton, a passenger in Long's truck, testified in substance material here as follows:

"Q. Now, do you recall whether or not you had any conversation with Mr. Long there as these two vehicles were approaching each other? A. I only made one remark.

"Q. What was that remark? A. That it was coming pretty fast.

"Q. And do you recall whether or not Mr. Long said anything? A. He said he was sure he could make it.

"Q. He said he was sure he could make that turn? A. Yes. * * *

"Q. Well, when you made that statement, you were not in the turn, were you? A. No, sir.

"Q. And when you made that statement, you started protecting your little boy immediately, didn't you? A. Yes, sir.

"Q. As a matter of fact, you held him up in your arms like any mother would do to try to shield him from the blow? A. Yes, sir.

"Q. You realized that you all were still on your own right hand side, you hadn't gone into your turn, you stated he was going fast, and Mr. Long said, 'I believe I can make it,' and you realized then that you had better get your little boy and try to protect him, didn't you? A. Well, I didn't know that there would be a collision.

"Q. Well, you thought there was going to be one, didn't you? You were afraid, weren't you, Ma'am? A. Yes, sir."

Appellee Joe William Surls testified in substance material here as follows: When he first saw Long's truck, Long had pulled over on his (Surls') side of the street and then weaved back on his (Long's) side. At this time Long was about fifty or sixty feet back of the intersection and Long did get back on his own side of the road, and when he first saw Long he (Surls) was about fifty or sixty feet north of the intersection. He was driving between thirty and thirty-five, about thirty-two or thirty-three possibly, when he first saw Long pull over on his (Surls') side of the road and then back to his (Long's) side of the road. About the crest of the hill, he had occasion to look at his speedometer and he was traveling thirty-three miles an hour at that time. He further testified:

"Q. What was the first thing you knew that there was going to be a collision? A. Well, after he made this —weaved over on my side of the street and then back, when he first did that, I thought about pulling over on the wrong side of the street, and then he got back on his side of the street, and then I said, 'Well, he is going to stay on that side,' and so I was going on down

my side of the street, and then after I got about in the intersection, why, then, he pulled across the street.

"Q. Did he pull—was he up to the intersection at that time? A. No, sir, he was not.

"Q. Was he making a ninety degree turn or forty-five degree, or what sort of an angle was he making there? A. No, he started out slightly across, in other words, he more or less angled a little more than forty-five, I would say, just angled across the street, instead of—

"Q. Well, if he had continued on, Mr. Surls, what traffic lane of Corning Avenue would he have entered? A. Well, I doubt if he would have entered on Corning.

"Q. Why do you say that? A. Well, I was even with the right side of the intersection on Corning and I doubt—."

He further testified he applied his brakes and the collision occurred on the west side of South Lancaster Road in the same traffic lane in which he was traveling. Traveling at a rate of speed of thirty-three miles an hour, he could stop within twenty or twenty-five feet unless there was gravel on the street like there was out there. If you just jam down on your brakes you are apt to slide and that is what happened.

The only question is whether or not the quoted evidence supports the jury's findings to issues 14 and 16. It is undisputed that the automobiles when they came within the vision of each other were each on the right side of the highway; that each party saw the other before the movement of Long across the road to his left to enter the cross street that dead-ended into Lancaster Road. At the time of the collision Surls' automobile had skidded its tires about 40 feet.

■ Under the record the question of whether or not Long's turning to the left in front of and across the path of the Surls automobile immediately before the accident, and his own evidence that he saw the oncoming Surls automobile before he turned across its path, raised questions of fact on discovered peril. We think it did.

■■ It is no longer the rule as asserted by appellant that actual discovery of the perilous position of the injured party must be proven by positive evidence. It is enough if the facts reasonably construed show that the party charged under all the evidence should have discovered the perilous position of the injured party. If the evidence raises the question as to whether the party charged should have under all the evidence discovered the perilous position, then the question as to fact as to whether he actually discovered it is for the jury since the credibility of all the witnesses, especially the parties, is for the jury, and their finding on discovery or non-discovery by Long of Surls' perilous position, if any, is binding. Ford v. Panhandle & Santa Fe Ry. Co., 151 Tex. 538, 252 S.W. 2d 561, and Note thereon in 32 T.L.R. 238, and in 6 Baylor Law Review 61.

■■ We have also reviewed the evidence as a whole and are of the opinion that the jury's findings on discovered peril are not so against the great weight of the evidence as to justify our remanding the cause for a new trial. We are also of the opinion that Long's turning to his left across the highway in the path of the oncoming Surls automobile and the jury's finding that such left turn was the sole proximate cause of the collision, is not in conflict with the jury's finding that Long, after he discovered the perilous position of Surls, failed to exercise ordinary care to use all means at hand to avoid the collision. From the evidence the jury was justified in concluding that instead of turning to the left across the path of the oncoming Surls automobile, he could have used the means at hand to either stop before going into his turn or to continue straight ahead. The jury under the evidence above quoted was also justified in finding that speed in excess of 30 miles per hour was not the proximate cause of the collision, but that

the proximate cause was Long's turning across the road in front of Surls' car. Points 1 to 9 are overruled.

■ Points 10 and 11 assert error in substance as follows: (10) In overruling Long's motion for mistrial because of irreconcilable conflict between the findings to issues 4 and 9; (11) in overruling appellants' motion for mistrial because there was an irreconcilable conflict between the jury's findings to issues 13 and 16. In issue 4 the jury found that the failure of Long to yield the right of way was the sole cause of the collision. In issue 9, considering the verdict as a whole, the jury found that while Surls was in a position of peril which had been discovered and realized by Long to be one from which Surls probably would not be able to extricate himself; and which discovery made by Long was in time that by the exercise of all means at his command, consistent with his own safety, he could have avoided the collision, but that notwithstanding such discovery he failed and did not exercise such means at hand to avoid the collision, which failure the jury found in answer to issue 9 to be the proximate cause of the collision and Surls' injuries and damages. Properly considered, Long's failure to yield the right of way and his failure to use all means at hand to avoid the collision are not in conflict. If he had yielded the right of way, he would not have failed to use all means at hand to avoid the collision. His failure to yield the right of way was one of the results of his failure to use all means at hand to avoid the collision; that is, to use all means at hand to either stop or to continue forward, on his side of the road and not to turn across the path of the Surls automobile. Issues 13 and 16 can also be reconciled when considered in the light of the charge as a whole. Issue 13 could not properly have been submitted as an issue on failure to exercise ordinary care, but was submitted on statutory negligence, to-wit, speed inside city limits in excess of 30 miles per hour. Issue 16 was submitted on common law negligence. We are of the opinion that the speed in question, though faster than the 30 miles per hour statutory speed limit, and therefore legally negligence per se, was not necessarily common law negligence, and the evidence was sufficient to support the jury's finding that under the circumstances it was not common law negligence. In the light of the evidence as a whole there is no conflict. Points 10 and 11 are overruled.

■ Points 12, 13, and 14 assert error: (12) In not granting new trial because of jury misconduct in discussing the matter of insurance; (13) in not granting a new trial on jury misconduct, because juror McDonald told the other jurors that as a general rule GI insurance was ordinarily $10,000; that on a badly disabled or totally disabled man they would pay $10,000; and that in most railroad accidents to employees the payment was around $10,000, thereby inducing the jury to agree on the verdict of $16,900; (14) in not granting a new trial on jury misconduct in discussing attorney fees that would be deducted from their award which led some of the jurors to increase the amount of damages they were willing to award.

Points 12, 13, and 14 involve alleged jury misconduct. Three of the jurors testified in effect insurance came up in the jury room, but that as soon as insurance was mentioned, the juror who mentioned it was cautioned that they could not consider that matter since not in evidence, and it ended there. When GI insurance being $10,000 was mentioned, the jury had already answered the damage issue, $16,900, and it was not changed and the jurors testified such mention of GI insurance did not in any way influence them.

The court's finding in support of his order overruling motion for a new trial after hearing all the evidence on the alleged misconduct, settled the question of harm against appellant. Points 12, 13, and 14 are overruled.

Point 15 in substance asserts error in permitting Dr. Hamel to testify as an expert as to the reasonable cost of future medical and hospital expenses to Surls.

The record shows Dr. Hamel had four years academic training at New Mexico A. & M., and four years training at Tulane University School of Medicine; had received his Medical Degree from Tulane University; had spent nine months as intern at Houston City-County Hospital; was then a Junior Surgical Resident at the same hospital and then served the Army until January 1952, as a doctor, the majority of his time doing orthopedic surgery; that he was a licensed physician to practice in Louisiana, but not in Texas, as in Texas he practiced his entire time with the Veterans Administration at McKinney which does not require a Texas license; that he is paid a salary by the government and that although fees are charged, all fees collected by him are the property of the U. S. Government. Appellants, to sustain their point, cite McCormick and Ray on Texas Law of Evidence, pp. 797, 798, sec. 633. Appellees cite the same work, page 818, sec. 643; 19 Tex.Jur., p. 76, sec. 50; and Edens-Birch Lumber Co. v. Wood, Tex.Civ.App., 139 S.W.2d 881. We have reviewed the authorities and the record and cannot hold that the trial court abused his discretion in permitting the doctor to testify over the objection above set out, and, too, the jury was not bound by the expert testimony on values. The objection at most, in our opinion, went to the weight of the evidence. We also hold that it was not necessary for the doctor to be licensed in Texas in order to enable him to testify as to the reasonable value of future medical services where such evidence is based upon his experience on such matters in the Veterans Hospital located in the City in which testimony was given and where the injury was received, the doctor having testified he knew the reasonable value of such services in Dallas. McCormick and Ray on Evidence, p. 808, sec. 638, where among other observations it is stated: "* * * Probably the most satisfactory rule is that anyone familiar with the values in question may testify, leaving the sufficiency of the knowledge to the discretion of the trial judge in each case." Point 15 is overruled.

Finding no reversible error in the judgment below, it is

Affirmed.

DIXON, Chief Justice (concurring).

I concur in the result, but I do not believe that under the facts of this case the principle of discovered peril is applicable.

YOUNG, Justice.

I concur in the conclusions reached by Justice CRAMER.